# United States Court of Appeals
## For the First Circuit

No. 07-1513

CHERRY HILL VINEYARD, LLC AND PHILIP BROOKS,

Plaintiffs, Appellants,

v.

JOHN E. BALDACCI, IN HIS OFFICIAL CAPACITY
AS GOVERNOR OF MAINE, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, Senior U.S. District Judge]

[Hon. Margaret Kravchuk, U.S. Magistrate Judge]

Before

Boudin, Chief Judge,
Selya, Senior Circuit Judge,
and Schwarzer,** Senior District Judge.

James A. Tanford, with whom Robert D. Epstein, Epstein Cohen
Donahoe & Mendes, Richard J. Silver, and Russell Silver &
Silverstein were on brief, for appellants.
Christopher C. Taub, Assistant Attorney General, with whom G.

---

*Of the Northern District of California, sitting by
designation.

Steven Rowe, Attorney General, Paul Stern, Deputy Attorney General, and Michelle Robert, Assistant Attorney General, were on brief, for appellees.

Lisa Hibner Tavani, Deputy Attorney General, State of New Jersey, with whom Anne Milgram, Attorney General of New Jersey, Lorinda Lasus, Deputy Attorney General, State of New Jersey, Troy King, Attorney General of Alabama, Dustin McDaniel, Attorney General of Arkansas, Joseph R. Biden III, Attorney General of Delaware, Thurbert E. Baker, Attorney General of Georgia, Lawrence Wasden, Attorney General of Idaho, Steve Carter, Attorney General of Indiana, Martha Coakley, Attorney General of Massachusetts, Mike Cox, Attorney General of Michigan, Jim Hood, Attorney General of Mississippi, Kelly A. Ayotte, Attorney General of New Hampshire, Gary K. King, Attorney General of New Mexico, Marc Dann, Attorney General of Ohio, Hardy Myers, Attorney General of Oregon, Greg Abbott, Attorney General of Texas, Mark Shurtleff, Attorney General of Utah, Darrell V. McGraw, Jr., Attorney General of West Virginia, and Roberto J. Sánchez-Ramos, Secretary of Justice, Commonwealth of Puerto Rico, on brief for States of New Jersey, Alabama, Arkansas, Delaware, Georgia, Idaho, Indiana, Massachusetts, Michigan, Mississippi, New Hampshire, New Mexico, Ohio, Oregon, Texas, Utah, and West Virginia, and the Commonwealth of Puerto Rico, amici curiae.

Carter G. Phillips, Jacqueline G. Cooper, Sidley Austin LLP, Craig Wolf, Joanne Moak, and Kent G. Huntington on brief for Wine and Spirits Wholesalers of America, Inc., American Beverage Licensees, The Presidents Forum of the Beverage Alcohol Industry, and National Beer Wholesalers Association, amici curiae.

Jerrol A. Crouter, Jonathan M. Goodman, and Drummond Woodsum & MacMahon on brief for Maine Chiefs of Police Association, amicus curiae.

Sarah L. Olson, Anne G. Kimball, Wildman, Harrold, Allen & Dixon LLP, Todd S. Holbrook, Peter J. Rubin, Bernstein, Shur, Sawyer & Nelson, and Arthur J. DeCelle, General Counsel, on brief for The Beer Institute, amicus curiae.

George T. Dilworth and McCloskey, Mina, Cunniff & Dilworth, LLC on brief for Maine Beer and Wine Wholesalers Association, amicus curiae.

---

October 11, 2007

---

**SELYA, Senior Circuit Judge**. This appeal calls upon us to assess Maine's decision to allow small wineries to operate partially outside the usual strictures of the State's alcohol control laws. The plaintiffs challenge this decision on the ground that it constitutes impermissible favoritism in violation of the dormant commerce clause. The district court found the challenge wanting.

While the central principles on which the dormant commerce clause operates are well-developed, gray areas exist around the edges. We believe that Maine's exception for small wineries falls within one of these gray areas — and in those precincts, courts must proceed case by case. Here, after careful perscrutation of Maine's statutory scheme and its constitutional implications, we find no substantial evidence that the exception for small wineries actually discriminates against interstate commerce. Consequently, we affirm the judgment of the district court.

## I. BACKGROUND

This case has been submitted on a stipulated record. Those stipulations limn the statutory scheme by means of which Maine regulates the sale of wine. To any extent that the statutes themselves are ambiguous, we assume that they operate and are enforced in the manner agreed upon by the parties.

## A. **The Statutory Scheme**.

As a general matter Maine, like many states, has chosen to regulate the distribution of alcoholic beverages by requiring that producers sell exclusively to licensed wholesalers who, in turn, may sell only to licensed retailers. Consumers may purchase alcoholic beverages for off-premises consumption only from licensed retailers and may do so only in face-to-face transactions. This three-tiered system has been justified on multiple grounds: as an efficient means of controlling the distribution of alcoholic beverages, as an effective means of promoting temperance, and as a facilitating means of collecting excise taxes. See, e.g., North Dakota v. United States, 495 U.S. 423, 432 (1990) (recognizing these as legitimate grounds); Wine & Spirits Retailers, Inc. v. Rhode Island, 481 F.3d 1, 13 (1st Cir. 2007) (recognizing promotion of temperance and control of alcohol distribution as legitimate legislative purposes). Its legitimacy has been vouchsafed by no less an authority than the Supreme Court. See Granholm v. Heald, 544 U.S. 460, 466 (2005); North Dakota, 495 U.S. at 432.

Consistent with this three-tiered system, Maine wineries may, for the most part, sell their wares in-state only to wholesalers. See Me. Rev. Stat. tit. 28-A, § 1361. But this edict admits of an exception for small vintners that obtain special "farm winery" licenses. See id. § 1355(3). To qualify for a farm winery license, a vineyard must produce no more than 50,000 gallons of

-4-

wine annually, see id. § 1355(3)(A), and must pay a modest license fee ($50 per year), see id. § 1551(3)(F). There are no geographic restrictions applicable to farm wineries, and licenses are available on the same terms to wineries located throughout the United States. Despite this equal footing, no winery outside of Maine has yet applied for a farm winery license.

Farm wineries enjoy a number of special prerogatives. For one thing, they may bypass wholesalers and sell directly to retailers and restaurants. Id. § 1355(3)(D). For another thing, they may sell directly to consumers; provided, however, that the transactions take place on the winery's premises or at one of up to two off-site locations established by the winery. Id. § 1355(3)(B)-(C). Out-of-state wineries may establish off-site sales outlets on the same basis as in-state wineries.

Sales made by farm wineries directly to consumers, wherever consummated, must be face to face. Id. This means, of course, that wine cannot be direct-shipped from a winery to a consumer. Indeed, Maine law expressly forbids the furnishing of alcoholic beverages via mail order services, see id. § 2077-B, and farm wineries are not exempt from that prohibition. Were a non-Maine winery to obtain a farm winery license, it too would be subject to this prohibition and could sell its products to Maine consumers only on the winery's premises or at a designated off-site location.

An additional provision of the statutory regime impinges indirectly upon the ability of out-of-state wineries to sell directly to Maine consumers.  See id. § 2077.  That provision prohibits a Maine resident from bringing more than four quarts of wine (typically five bottles) into the state.  Id.  Individuals may obtain relief from this import limitation only by special request.  Id. § 2073(3)(A).  Such requests are evaluated on a case-by-case basis by a state agency.  Id.  The parties have stipulated that, when requested, such permission is "generally granted."  In the absence of such a dispensation, a Maine resident visiting an out-of-state winery and purchasing wine in person would be statutorily forbidden from bringing more than four quarts home with her, and the winery would be statutorily forbidden from shipping purchased wine to consumers in Maine.

## B.  **Travel of the Case**.

We turn now from the statutory scheme to the particulars of this case.  On September 27, 2005, two plaintiffs — Dr. Philip Brooks, a Maine resident and oenophile, and Cherry Hill Vineyard, LLC, an Oregon winery that produces fewer than 50,000 gallons of wine a year — filed a civil action in Maine's federal district court against a number of state hierarchs.[1]  In their complaint,

---

[1]The defendants, all of whom are sued in their official capacities, are the governor, the attorney general, and the two ranking officers of Maine's Bureau of Liquor Enforcement.  We sometimes refer to the defendants, collectively, as "Maine" or "the State."

they alleged that Maine's farm winery program, in conjunction with the prohibition on direct shipping, has the effect of discriminating against interstate commerce in violation of the dormant commerce clause.[2] They prayed for a declaration that the statutory scheme is unconstitutional insofar as it prevents out-of-state wineries from selling their merchandise directly to Maine consumers. Relatedly, they sought injunctive relief barring enforcement of sections 1361(4), 2077, and 2077-B against wineries that choose to sell or ship their wares directly to Maine consumers.

The State defended the face-to-face transactional requirement and the related restriction on direct shipping as necessary to prevent underage persons from gaining access to alcoholic beverages. Wholesalers and retailers have a vested interest in the three-tiered system and, by leave of court, a trade group — the Maine Beer and Wine Wholesalers Association — appeared as an amicus curiae in support of the statutory scheme.

The parties compiled a stipulated record and cross-moved for summary judgment. The district court referred the motions to a magistrate judge, who concluded that the face-to-face

---

[2]We think it noteworthy that the plaintiffs have not challenged the importation limit, see Appellants' Br. at 15 n.18, but, rather, treat it as aggravating the unconstitutional discrimination of which they complain. Because the plaintiffs have chosen to focus their challenge on the farm winery exception and the face-to-face sales requirement, we eschew any particularized analysis of the constitutionality of the importation limit.

transactional requirement and the related ban on direct shipping, as memorialized in Maine's statutory scheme, did not discriminate against interstate commerce but, instead, comprised a reasonable exercise in regulation designed to forestall the sale of alcoholic beverages to minors. Cherry Hill Vineyard, LLC v. Baldacci, Civ. No. 05-153, 2006 WL 2121192, at *8-9 (D. Me. July 27, 2006). The district court summarily adopted the magistrate judge's recommended decision and granted summary judgment for the defendants. Cherry Hill Vineyard, LLC v. Baldacci, Civ. No. 05-153 (D. Me. Mar. 5, 2007) (unpublished). This timely appeal followed.

We note, with appreciation, that five separate sets of amici have filed helpful briefs (all of them urging affirmance of the judgment below). There is an interesting wrinkle concerning the arguments advanced by the amici. The plaintiffs, citing our decisions in United States v. Sturm, Ruger & Co., 84 F.3d 1, 6 (1st Cir. 1996), and Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 705 n.22 (1st Cir. 1994), argue that amici cannot raise new arguments. In both of the cited cases, however, amici wished to advance novel arguments on behalf of appellants. Here, the amici have appeared in support of the appellees. Given our settled rule that an appellate court may affirm the entry of summary judgment on any ground made manifest by the record, see, e.g., Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006), this is quite probably a material difference. In any event, the point is of mainly

-8-

academic interest, as we affirm on the basis of a line of argument consistently propounded by the State.

## II. ANALYSIS

Because the district court acted under the aegis of Federal Rule of Civil Procedure 56, our review is de novo. See Auburn Police Union v. Carpenter, 8 F.3d 886, 892 (1st Cir. 1993). Here, our de novo review begins with first principles. The Constitution grants Congress the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. This affirmative grant of power to the federal sovereign has long been understood, by necessary implication, to strip state governments of any authority to impede the flow of goods between states. See Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 35 (1st Cir. 2005).

The doctrine that surrounds this principle, sometimes referred to as the dormant commerce clause, holds that a state regulation that discriminates against interstate commerce on its face, in purpose, or in effect is highly suspect and will be sustained only when it promotes a legitimate state interest that cannot be achieved through any reasonable nondiscriminatory alternative. Id. Laws that regulate evenhandedly and only incidentally burden commerce are subjected to less searching scrutiny under a balancing test, which operates to validate a challenged regulation unless it burdens commerce in a way that is

"clearly excessive in relation to the putative local benefits" to be derived therefrom. Wine & Spirits Retailers, 481 F.3d at 11 (citing Pike v. Bruce Church, 397 U.S. 137, 142 (1970)).

### A. The Plaintiffs' Argument.

This is a rifle-shot appeal. The plaintiffs do not advance any argument under the Pike balancing test. They must, therefore, avail themselves of the strict scrutiny reserved for statutes that frankly discriminate against interstate commerce. Even within that taxonomy, the plaintiffs' objection is narrow; they forgo any argument that the challenged portions of Maine's statutory scheme are discriminatory either on their face or in their conceived purpose.

Winnowing out these possibilities, the plaintiffs pin their hopes on the isthmian claim that the challenged portions of the Maine regime are discriminatory in effect, that is, that by allowing direct sales to consumers only in face-to-face transactions, the statutory scheme has the practical effect of benefitting Maine wineries at the expense of their out-of-state competitors. In advancing this argument, the plaintiffs remind us that, for this purpose, discrimination has been broadly defined as "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Or. Waste Sys. v. Dep't of Envtl. Quality, 511 U.S. 93, 99 (1994).

Challenges of this type have a theoretical basis in the case law. Even facially neutral laws enacted without discriminatory motive and in furtherance of legitimate local objectives may be discriminatory in effect (and, thus, engender strict scrutiny under the jurisprudence of the dormant commerce clause). See, e.g., Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 352-53 (1977); Trailer Marine Transp. Corp. v. Rivera Vazquez, 977 F.2d 1, 10 (1st Cir. 1992).

When such a challenge is mounted, the initial burden of establishing discrimination rests with the challenger. See Hughes v. Oklahoma, 441 U.S. 322, 336 (1979). Once discrimination is established, however, the devoir of persuasion shifts and the affected state must demonstrate that no reasonable nondiscriminatory regulation could achieve its objectives. See New Energy Co. v. Limbach, 486 U.S. 269, 278 (1988).

With this background in place, we frame the issue. The plaintiffs argue that the requirement that direct sales take place on winery premises effectively prevents out-of-state wineries, many of which are geographically distant, from enjoying any real opportunity of selling directly to consumers. In-state wineries, the plaintiffs say, are not similarly disadvantaged because consumers can much more readily travel to their premises. So, the plaintiffs' thesis runs, the regime's effect is to raise the cost of, say, west coast wines as compared to Maine wines since the

-11-

former will, as a practical matter, be available to consumers only after the addition of hefty "middleman" mark-ups.[3]  See generally Granholm, 544 U.S. at 474 (calling the retailer and wholesaler "two extra layers of overhead" that "increase . . . cost").  Moreover, wines produced by small out-of-state wineries that are unable to attract the attention of a retailer or wholesaler may be unavailable in Maine altogether.  Indeed, the plaintiffs argue, in order to reach Maine consumers for face-to-face transactions, out-of-state wineries would necessarily be burdened with opening off-site locations within the Maine market.  Establishing that kind of presence would further escalate costs.[4]

The plaintiffs conclude by asserting that the discriminatory burden imposed by the face-to-face sales requirement and the related ban on direct shipping cannot be justified as necessary to any legitimate governmental interest.  They insist that the State can fulfill its goal of restricting access to alcoholic beverages on the part of underage youths by, say,

---

[3]In mounting this argument, the plaintiffs attempt to distinguish between the cost attributable to the statutory requirements and any added expense that is attributable to geographic reality (for example, the fact that Oregon wine must be shipped cross-country in order to reach Maine consumers will inevitably add to its cost).

[4]Although the plaintiffs do not challenge Maine's four-quart importation limit, see supra note 2, they complain that their disadvantage is compounded by that limit.  In practice, the importation limit prevents even committed wine collectors who are willing to travel from bringing home enough wine to justify the journey.

mandating that carriers delivering wine to direct purchasers confirm that recipients are at least twenty-one years of age. See, e.g., Mich. Comp. Laws § 436.1203 (taking this approach). On this basis, the plaintiffs asseverate that the face-to-face requirement and the related ban on direct shipping cannot withstand strict scrutiny.

### B. **The Rejoinder**.

Although vigorously asserted by able counsel, this argument lacks force. When all is said and done, the plaintiffs have not satisfied their initial burden of showing that Maine's statutory scheme is discriminatory in effect. Without such evidence, we must defer to the state legislature, which "has 'virtually complete control' over the importation and sale of liquor and the structure of the liquor distribution system." North Dakota, 495 U.S. at 431 (quoting Cal. Retail Liquor Dealers Ass'n v. Midcal Alum., Inc., 445 U.S. 97, 110 (1980)).

To be sure, the plaintiffs cite a plethora of cases in endeavoring to demonstrate that the expense added by the restriction on direct shipment offends the dormant commerce clause. But these decisions are not capable of carrying the weight that the plaintiffs load upon them.

The plaintiffs' most loudly bruited authority is Granholm, in which the Supreme Court invalidated Michigan and New York restrictions on the direct shipping of alcohol by out-of-state

wineries. Despite some superficial similarities, the fit between Granholm and this case is not exact and, thus, the decision is of limited utility here.[5] The novel aspect of Granholm was the Court's holding that the Twenty-First Amendment — a constitutional provision dealing with the regulatory power of the several states in regard to the manufacture, distribution, and sale of alcoholic beverages — cannot salvage explicitly discriminatory regimes even though the regulated product is an alcoholic beverage. See Granholm, 544 U.S. at 493. The Twenty-First Amendment is only peripherally involved in this case, and does not require discussion. On the issue before us, Granholm does not dictate the result. That opinion provides less than complete guidance, and virtually no new elaboration, with respect to what does — or does not — constitute discrimination against interstate commerce.

Both the Michigan and New York schemes invalidated in Granholm discriminated against out-of-state purveyors — and did so in ways that long have been understood to be unconstitutional. See id. at 467 (terming the discrimination "explicit"); see also id. at 472-76. The Michigan scheme was discriminatory on its face — it allowed in-state producers to ship wines directly to Michigan

---

[5]The Granholm Court did express skepticism as to whether a ban on direct shipping furthers the goal of limiting the access of underage youths to alcohol. See 544 U.S. at 490. Thus, were the plaintiffs able to carry their initial burden of putting forth substantial evidence showing an impermissibly discriminatory effect, Granholm might have more impact on other elements within the decisional calculus.

consumers while banning out-of-state producers from doing so. See id. at 473-74. Thus, the finding of unconstitutionality does not assist the present plaintiffs.

The New York scheme was closer, but still different; it allowed wineries to direct-ship only if they first established a physical presence in New York. See id. at 474. The scheme was found to "allow in-state wineries to sell wine directly to consumers in that State but to prohibit out-of-state wineries from doing so, or, at the least, to make direct sales impractical from an economic standpoint." Id. at 466. The plaintiffs insist that the Maine scheme operates much the same as the New York scheme because, in practical effect, it gives in-state producers preferential access to consumers. While one district court, drawing heavily on Granholm, has found discriminatory a requirement that direct wine sales be made face to face, see Cherry Hill Vineyard, LLC v. Hudgins, 488 F. Supp. 2d 601, 618-19 (W.D. Ky. 2006), other courts disagree, see, e.g., Baude v. Heath, Civ. No. 05-0735, ___ F. Supp. 2d ___, ___ n.25 (S.D. Ind. Aug. 29, 2007) [2007 WL 2479587, at *16 n.25]; Jelovsek v. Bresden, 482 F. Supp. 2d 1013, 1020-21 (E.D. Tenn. 2007); Hurley v. Minner, Civ. No. 05-826, 2006 WL 2789164, at *6 (D. Del. Sept. 26, 2006).

We concur with the latter courts. The plaintiffs in this case overlook a key distinction between the New York and Maine statutes. New York created an additional barrier to the entry of

-15-

out-of-state wineries into the direct-shipping market — a barrier that Maine has not erected. To elaborate, New York created a direct-shipping market for wine; it allowed direct shipping on particular conditions, and those conditions were rigged to favor in-state wineries (which, unlike out-of-state wineries, would not have to set up separate sales outlets within New York's boundaries). See Granholm, 544 U.S. at 474. Maine flatly outlaws any and all direct shipping of wine. Consequently, there is no direct-shipping market; neither in-state nor out-of-state wineries may direct-ship. Hence, while well-established legal rules demanded the invalidation of both the Michigan and New York schemes, see, e.g., Or. Waste Sys., 511 U.S. at 99-100, those rules do not demand any such ukase here.

By the same token, most of the other cases chronicled by the plaintiffs involve statutes that — unlike the Maine regime at issue here — explicitly discriminate against out-of-state goods or products. See, e.g., id. at 99; Chem. Waste Mgmt., Inc. v. Hunt, 504 U.S. 334, 342 (1992); City of Philadelphia v. New Jersey, 437 U.S. 617, 627 (1978). These cases are distinguishable because Maine's statutory scheme vis-à-vis farm wineries does not explicitly discriminate against interstate commerce. Farm winery licenses are available on equal terms to in-state and out-of-state vineyards alike, and Maine's ban on the direct shipping of wine applies evenhandedly across the board.

We are, then, on terra incognita.  In the absence of any explicit (i.e., facial) discrimination, the plaintiffs must persuade us that Maine's evenhanded requirement that all wine purchases be made face to face camouflages some more sinister reality: that its practical effect is invidiously discriminatory.  This is a burden that litigants in analogous cases ordinarily have failed to carry.  See, e.g., Brown & Williamson Tobacco Corp. v. Pataki, 320 F.3d 200, 212-14 (2d Cir. 2003) (upholding, as against a dormant commerce clause challenge, state law requiring that all tobacco sales be conducted in face-to-face transactions).

The Supreme Court has not directly spoken to the question of what showing is required to prove discriminatory effect where, as here, a statute is evenhanded on its face and wholesome in its purpose.  In our view, that showing must be substantial — and an examination of the evidence in the record satisfies us that the plaintiffs have not pushed past this plateau.  We explain briefly.

We previously have held that a plaintiff bringing a dormant commerce clause challenge based exclusively on the allegedly discriminatory effect of a statutory scheme is required to submit some probative evidence of adverse impact.  See Alliance of Auto. Mfrs., 430 F.3d at 41 (upholding summary judgment when plaintiff "offered only prognostications woven from the gossamer strands of speculation and surmise, unaccompanied by any significantly probative evidence" of a discriminatory effect on commerce); accord

-17-

R & M Oil & Supply, Inc. v. Saunders, 307 F.3d 731, 735 (8th Cir. 2002) (holding that plaintiff had failed to provide sufficient evidence to prove discriminatory effect); E. Ky. Res. v. Fiscal Ct. of Magoffin County, 127 F.3d 532, 544 (6th Cir. 1997) (finding no discriminatory effect when plaintiffs failed to present evidence showing how out-of-state entities, as compared to in-state entities, were burdened).

Sweeping aside rhetorical flourishes, the plaintiffs have proffered no evidence that permitting farm wineries to sell only face to face, either on premises or at approved in-state locations, discriminates against interstate commerce. There is no evidence that Maine law acts to protect Maine vineyards or that Maine consumers substitute wines purchased directly from Maine vineyards for wines that they otherwise would have purchased from out-of-state producers. There is not even evidence that any wines at all are purchased by consumers directly from Maine vineyards. And, finally, nothing contained in the stipulated record suggests that the locus option somehow alters the competitive balance between in-state and out-of-state firms. Cf. Hunt, 432 U.S. at 351 (holding that statutory scheme designed to eliminate out-of-state companies' competitive advantage in marketing created an unconstitutionally discriminatory effect).

The substitution scenario is further weakened by the fact that the plaintiffs have adduced no evidence that would in any way

-18-

undermine the plausible impression that Maine consumers (like imbibers everywhere) view trips to a winery as a distinct experience incommensurate with — and, therefore, unlikely to be replaced by — a trip to either a mailbox or a retail liquor store. See Jelovsek, 482 F. Supp. 2d at 1021 (observing that "it seems the market for on-site wine purchases, requiring the effort (or pleasure) of a trip to the winery, is different in kind and reach from the convenience-oriented market that would be created and facilitated by a law allowing direct-shipping").[6] Nor have they offered evidence to impeach the suggestion, made in one of the cases on which they rely, that bottles of wine are unique and, thus, unlikely to be perceived by consumers as interchangeable. See Hudgins, 488 F. Supp. 2d at 617; see also Gen. Motors Corp. v. Tracy, 519 U.S. 278, 299 (1997) (observing that "difference[s] in products may mean that the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed").

The plaintiffs' principal effort to fill this void involves a report prepared by the Federal Trade Commission (FTC). Drawing on this report, they argue that the ban on direct shipping raises the cost of out-of-state wines and prices some wines out of

---

[6]The plaintiffs question the discussion in Jelovsek, presently pending on appeal before the Sixth Circuit, on the ground that the case was decided on the pleadings. Whatever the situation in Jelovsek, the plaintiffs here had ample opportunity to flesh out the record, yet they still have not been able to furnish probative evidence of discriminatory effect.

-19-

the Maine market altogether. FTC, Possible Anticompetitive Barriers to E-Commerce: Wine (July 2003) [FTC Report], available at http://www.ftc.gov/os/2003/07/winereport2.pdf (last visited Sept. 20, 2007). But nothing in the FTC Report establishes that the farm winery exception disproportionately burdens interstate commerce.

The plaintiffs also repeatedly cite Associated Indus. of Mo. v. Lohman, 511 U.S. 641 (1994), for the proposition that discrimination should be measured in dollars and cents, such as in lost sales. See id. at 654. Even if that is so, however, the plaintiffs have not shown a single penny of losses attributable to the allegedly discriminatory farm winery exception. They invite us to infer the existence of such losses but prudence requires that we decline that invitation. In our judgment, the mere fact that a statutory regime has a discriminatory potential is not enough to trigger strict scrutiny under the dormant commerce clause. See id. (noting that the Justices "have never deemed a hypothetical possibility of favoritism to constitute discrimination that transgresses constitutional commands"). There must be substantial evidence of an actual discriminatory effect, and such evidence is utterly absent here.[7] Given Maine's large land mass and the

---

[7]Cherry Hill's complaint that it will be forced to establish off-site locations geographically closer to Maine consumers in order to attract Maine business appears in some sense to be a complaint about the effects of geography. Distance is not congruent with state lines, and the effects of geography alone do not constitute impermissible discrimination. An effect is not discriminatory, in violation of the dormant commerce clause, if it

concentration of its population in the southern end of the state, see Grant's Dairy — Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 21 (1st Cir. 2000), it cannot plausibly be said that the farm winery exception redounds to the exclusive benefit of Maine vineyards. Rather, whatever minimal benefits might be inferred from the structure of the scheme itself seem largely to be dispersed on the basis of geography.

In short, there is simply no evidence that out-of-state wineries suffer any disproportionate loss of business on account of Maine's direct-shipping ban. The plaintiffs have made no showing that any discrimination vis-à-vis access to the Maine market actually results from the farm winery exception itself. While the FTC Report and the plaintiffs' other evidentiary proffers suggest that a direct-shipping ban harms out-of-state producers, the plaintiffs acknowledge that the "constricted availability of wine is due in large part to the three-tier system itself." Appellants' Br. at 10. Because the three-tiered system has not been challenged here, this acknowledgment undercuts any inference that the allegedly

_____

results from natural conditions. See Doran v. Mass. Turnpike Auth., 348 F.3d 315, 319 (1st Cir. 2003); Grant's Dairy — Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 21 (1st Cir. 2000); see also Baude, Civ. No. 05-0735, at *27-28.

-21-

discriminatory farm winery exception is responsible for the perceived harm.[8]

The plaintiffs' response to this lack of evidence is an assertion that even if "the impact is small because direct sales do not constitute a significant market and . . . in-state wineries do not do much walk-in business," the regime is nonetheless unconstitutional because the dormant commerce clause contains no de minimis exception. Appellants' Reply Br. at 8. But the case upon which they rely for this proposition, Camps Newfound/Owatonna v. Town of Harrison, 520 U.S. 564 (1967), concerned a statute that was discriminatory on its face. See id. at 581. It strikes us as implausible that the same de minimis standard would apply when evaluating whether a facially neutral statute has a discriminatory effect on interstate commerce. See Brown & Williamson Tobacco, 320 F.3d at 216 (finding a "de minimis advantage to in-state [companies] . . . insufficient to establish a discriminatory effect"); cf. New Energy, 486 U.S. at 276 (commenting that "where discrimination is patent . . . neither a widespread advantage to in-state interests

---

[8]To be sure, Granholm may reflect a retrenchment of the broad state power over the distribution and sale of alcoholic beverages that characterized earlier Supreme Court jurisprudence. But it does not appear, on the basis of Granholm alone, that a challenge can successfully be mounted to the three-tiered system. See Granholm, 544 U.S. at 466 (reaffirming that "States can mandate a three-tier distribution scheme in the exercise of their authority under the Twenty-first Amendment"); id. at 493 ("If a State chooses to allow direct shipment of wine, it must do so on evenhanded terms."); see also U.S. Const. amend. XXI. Any further step away from such a scheme is for the Supreme Court to take.

nor a widespread disadvantage to out-of-state competitors need be shown") (emphasis supplied).

The de minimis standard, when used in cases involving facially discriminatory laws, speaks to the <u>degree</u> of discrimination. It cannot sensibly be used to answer the different question of whether discriminatory effect exists. In other words, it is only once the fact of discrimination has been proved that the de minimis standard comes into play. It follows that the plaintiffs cannot succeed in this case merely by invoking the de minimis standard and ignoring their burden to proffer substantial evidence of discrimination.

This result appeals to common sense. Were we to require no showing beyond the de minimis level, no distinction would exist between the discriminatory effect test and the incidental burden test employed by the Supreme Court in <u>Pike</u>, 397 U.S. at 142. While the Court has recognized that "there is no clear line separating the category of state regulation that is virtually <u>per</u> <u>se</u> invalid under the Commerce Clause, and the category subject to the <u>Pike</u> v. <u>Bruce Church</u> balancing approach," <u>Brown-Forman Distillers Corp.</u> v. <u>N.Y. State Liquor Auth.</u>, 476 U.S. 573, 579 (1986), it has nonetheless continued to maintain that distinction. We do not propose to abolish it today.

In a last-ditch effort to put the genie back in the bottle, the plaintiffs essay a naked appeal to the logic of the

argument that some discriminatory effects must result from a regime that allows consumers to go to in-state wineries and buy as much wine as they want but precludes them from ordering wine directly from out-of-state wineries.  Conjecture, however, cannot take the place of proof.[9]

## III.  CONCLUSION

We need go no further.  The short of the matter is that the plaintiffs have not carried their burden of showing that the challenged regulation is discriminatory in effect.  In the absence of such a showing, the plaintiffs' constitutional challenge fails.

**Affirmed**.

---

[9]In any event, this sortie smacks of an attack on the import limitation — and the plaintiffs have foresworn any direct attack on that limitation.  See supra note 2.  They cannot have their cake and eat it too.